[No. H007885. Sixth Dist. Apr. 9, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
JEFFREY LEUNG et al., Defendants and Appellants.

**COUNSEL**

Christopher Blake, Peter A. Estern and Corinne W. Shulman, under appointments by the Court of Appeal, for Defendants and Appellants.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Stan M. Helfman and Violet M. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**CAPACCIOLI, Acting P. J.**—Defendants were convicted of robbery, attempted robbery and false imprisonment. Weapons and arming enhancements were found true. On appeal they argue that (1) the restriction on jury voir dire embodied in Code of Civil Procedure section 223 arbitrarily distinguishes between criminal and civil proceedings in violation of criminal litigants' right to equal protection under the law, (2) a prearrest photographic identification procedure was unduly suggestive and it was prejudicial error to admit evidence of this photographic identification at trial, (3) there were sentencing errors, (4) there were clerical errors and (5) defendant Chan asserts that the court should have issued a judicial recommendation against deportation. For the reasons expressed below, we affirm the judgments and order modification of the abstracts of judgment to correct clerical errors.

FACTS

On December 30, 1989, at 1:30 a.m. a man carrying an iron pipe entered the upstairs of the Miyake Restaurant. This man was defendant Jeffrey Leung. Jeffrey approached Akira Nakamura and Kikuo Tsujimoto (hereinafter Kikuo) and told them to hand over all the money. He forced them to go into the interior of the restaurant office. A man with a pistol then came upstairs from the first floor of the restaurant This man was David Leung. Each man wore a mask over the lower part of his face. David pointed the gun

at Mr. Nakamura. Mr. Nakamura took money out of his wallet and gave it to Jeffrey. Restaurant receipts of approximately $2,000 in cash were lying on a table in a brown paper bag. Jeffrey took this money. One of the men took a bag from Kikuo.

A third man wearing a mask and carrying a knife came up from downstairs. Jeffrey handed Mr. Nakamura some handcuffs and had him handcuff one of his hands and one of Kikuo's hands to a chair. Jeffrey then pulled the phone cord out of the wall. The three men went downstairs.

Moriyaki Nagayama was in the kitchen with Hiroshi Tsujimoto (hereinafter Hiroshi) preparing food for the next day at the time of the robbery. A man with a gun came into the kitchen. This man was David Leung. David told Hiroshi and Mr. Nagayama to raise their hands. A man without any weapon also came into the kitchen. He was wearing a handkerchief over the lower portion of his face. This man was Michael Chan. David pointed the gun at Hiroshi and Mr. Nagayama. David and Chan then forced the two men to proceed to the basement. A third man joined them on their way to the basement. David kicked Mr. Nagayama as he went down the steps to the basement. Once they reached the basement, David and the third man went back upstairs. Chan remained and told Mr. Nagayama to give him money. Mr. Nagayama gave Chan $100 from his pocket. Chan then turned to Hiroshi and asked Hiroshi to give him money. Hiroshi produced his wallet but there was no money in it. Chan told Mr. Nagayama and Hiroshi not to move and to "stay there" and then he went upstairs. A man with a pipe stood guard at the top of the stairs. Mr. Nagayama and Hiroshi later saw four men leave the restaurant.

Ten days after the robbery, Mr. Nagayama, Mr. Nakamura and Hiroshi and Kikuo identified defendants at a photographic identification.[1] Defendants were charged by information with three counts of robbery (Pen. Code, §§ 211/212.5, subd. (b)), one count of attempted robbery (Pen. Code, §§ 664/211/212.5, subd. (b)) and four counts of false imprisonment (Pen. Code, §§ 236/237). It was further alleged that David Leung had personally used a gun (Pen. Code, § 12022.5, subd. (a)), Jeffrey Leung had personally used a pipe (Pen. Code, § 12022, subd. (b)) and all three defendants had been armed with a firearm within the meaning of Penal Code section 12022, subdivision (a)(1). Pursuant to Penal Code sections 667 and 667.5, subdivision (b), Jeffrey Leung was charged with prior felony convictions and prior prison terms.

Defendants moved *in limine* to suppress evidence of the prearrest photographic identification as the product of an unduly suggestive identification

---

[1] A fourth man, Andrew Liu, was tried separately.

procedure. After a lengthy evidentiary hearing, the court determined that the identification procedure was not suggestive and therefore denied the motion.

Defendants were convicted on all counts and the enhancements were found true. Jeffrey Leung admitted the allegations of prior convictions and prior prison terms. Michael Chan was sentenced to six years, eight months in state prison. Jeffrey Leung was sentenced to sixteen years, eight months in state prison. David Leung was sentenced to nine years, eight months in state prison.

## DISCUSSION

### A. Challenge to Code of Civil Procedure Section 223

██ Defendants assert that Code of Civil Procedure section 223 unconstitutionally prohibits criminal litigants, but not civil litigants, from conducting voir dire in support of peremptory challenges. ██ ■ ■ Thus, defendants claim that the application of that statute below prejudiced them and requires reversal of their convictions.[2] ██ Code of Civil Procedure section 223, as enacted by the voters in Proposition 115, provides as follows:

---

[2] The Attorney General's brief failed to address the issue of defendants' standing to challenge the statute. Nevertheless, the Attorney General belatedly raised the issue of standing at oral argument. Although standing is not the dispositive issue in this case, it is worthy of discussion since it limits those who may assert the invalidity of the challenged statute.

"One who seeks to raise a constitutional question must show that his rights are affected injuriously by the law which he attacks and that he is actually aggrieved by its operation." (*People* v. *Black* (1941) 45 Cal.App.2d 87, 96 [113 Cal.Rptr. 746].) "It is a firmly established principle of law that one may not urge the unconstitutionality of a statute unless his rights are adversely affected thereby (16 C.J.S., Constitutional Law, § 76). Under this rule, appellant would appear to have no standing to make the present contention [that the statute violates equal protection], for its rights are in no way adversely affected . . . ." (*County of Ventura* v. *So. Cal. Edison Co.* (1948) 85 Cal.App.2d 529, 539 [193 P.2d 512].) An individual therefore has no standing to challenge the validity of a statute unless that individual has been impacted by the enforcement of the statute.

In this case, it is at least arguable that the challenged portion of Code of Civil Procedure section 223 was enforced below. After completing its examination of the initial panel of prospective jurors, the court said: "Counsel, I'm going to offer you the opportunity to present specific questions that you may wish to have the court ask of any of the jurors specifically related to challenges *for cause*. [¶] If you have a request to ask direct questions of any jurors *for cause*, you may make that showing of cause at this time and indicate to the court exactly what questions you may have to ask." (Italics added.) Defense counsel and the prosecutor then proposed several questions for the jury. No questions were excluded as unrelated to challenges for cause. The court did not specifically request or entertain counsels' suggestions as to questions related solely to peremptory challenges.

While the record does not reflect that any questions proposed by counsel were excluded, the court's statement could be construed as a statement that the court was enforcing the statute's limitation on voir dire. Hence, defendant, at least arguably, has standing to challenge the statute as unconstitutional.

"In a criminal case, the court shall conduct the examination of prospective jurors. However, the court may permit the parties, upon a showing of good cause, to supplement the examination by such further inquiry as it deems proper, or shall itself submit to the prospective jurors upon such a showing, such additional questions by the parties as it deems proper. Voir dire of any prospective jurors shall, where practicable, occur in the presence of the other jurors in all criminal cases, including death penalty cases. [¶] *Examination of prospective jurors shall be conducted only in aid of the exercise of challenges for cause.* [¶] The trial court's exercise of its discretion in the manner in which voir dire is conducted shall not cause any conviction to be reversed unless the exercise of that discretion has resulted in a miscarriage of justice, as specified in Section 13 of Article VI of the California Constitution." (Code Civ. Proc., § 223, italics added.)

### 1. *Nature of the "Right"*

#### a. *The Peremptory Challenge*

■ "[T]he peremptory challenge is not a constitutional necessity but a statutory privilege." (*People* v. *Wheeler* (1978) 22 Cal.3d 258, 281, fn. 28 [148 Cal.Rptr. 890, 583 P.2d 748].) " '[N]either the United States Constitution nor the Constitution of California . . . requires that Congress or the California Legislature grant peremptory challenges to the accused [or prosecutor] or prescribes any particular method of securing to an accused [or prosecutor] the right to exercise the peremptory challenges granted by the appropriate legislative body. [Citations.] *The matter of peremptory challenges rests with the Legislature, limited only by the necessity of having an impartial jury.*' " (*Ibid.,* quoting *People* v. *King* (1966) 240 Cal.App.2d 389, 399-400 [49 Cal.Rptr. 562, 21 A.L.R.3d 706] (italics added); accord, *People* v. *Ainsworth* (1988) 45 Cal.3d 984, 1005 [248 Cal.Rptr. 568, 755 P.2d 1017].)

#### b. *Restriction on Voir Dire*

Until 1981, the California Supreme Court had long held that the trial court could prohibit voir dire examination which was engaged in solely for the purpose of gaining information relevant to the exercise of peremptory challenges. (*People* v. *Edwards* (1912) 163 Cal. 752 [127 P. 58].) In *Edwards,* the trial court had refused to permit defense counsel to examine a juror for the purpose of determining whether or not to exercise a peremptory challenge to that juror. (*Id.* at p. 753.) Finding no statutory authorization for allowing "the examination of a juror for the purpose of enabling the parties intelligently to determine whether or not to make a peremptory challenge," the California Supreme Court approved the trial court's limitation on voir

dire. (*Id.* at p. 754.) "It [voir dire solely in support of peremptory challenges] tends to encourage inquiries into matters wholly collateral to the case at hand. The field of inquiry upon subjects properly involved in the endeavor to ascertain whether the juror is free from actual or implied bias is so broad that it will give each party ample opportunity to obtain information concerning the advisability of making peremptory challenges to the respective jurors." (*Id.* at p. 755.) The court therefore held that a defendant " 'cannot embark in a general exploration for the sole purpose of satisfying himself whether it will be safe to be tried by a juror against whom no legal objections can be urged.' " (*Id.* at pp. 755-756, quoting *People* v. *Hamilton* (1882) 62 Cal. 382.)

In 1981 the California Supreme Court abandoned the rule expressed in *Edwards* and held that "counsel should be allowed to ask questions reasonably designed to assist in the intelligent exercise of peremptory challenges whether or not such questions are also likely to uncover grounds sufficient to sustain a challenge for cause." (*People* v. *Williams* (1981) 29 Cal.3d 392, 407 [174 Cal.Rptr. 317, 628 P.2d 869].) In *Williams*, the central issue at trial had been self-defense. Defendant asserted that he had been entitled to use force to defend himself, his grandson and his home against the victim. The victim had come to defendant's home, challenged defendant, struggled with defendant and had then been shot. During voir dire, defense counsel attempted to inquire of a prospective juror whether, if so instructed, she would be able to conceive of a "hypothetical, reasonable and prudent man" in order to apply a reasonable person standard of conduct. (*Id.* at pp. 397-398, 410-411.) The prosecution's objection to the question was sustained. Defense counsel requested that he be permitted to ask the prospective jurors "whether they would willingly follow an instruction to the effect that a person has a right to resist an aggressor by using necessary force and has no duty to retreat." This request was denied. Counsel was permitted to ask the prospective jurors whether they would follow self-defense instructions even if they disagreed with the law. Two prospective jurors indicated some discomfort with doing so. (*Id.* at p. 398.)

On appeal, Williams asserted that the questions should not have been excluded "either because they may have led to challenges for cause and were therefore properly within the scope of the existing voir dire standard, or because they could have assisted counsel in the intelligent exercise of peremptory challenges . . . ." (29 Cal.3d at p. 398.) The California Supreme Court criticized the *Edwards* rule as "arbitrary and difficult to apply, erratic in achievement of its desired end, and insensitive to the constitutional mandate that defendant be tried before a fair and impartial jury" and noted that "if it were applied with strict logic it would impose no significant

limitation on 'tedious examination.'" (*Id.* at p. 399.) "Because counsel can know if a question will expose bias only by awaiting the answer, and because the judge must rule on the propriety of the question before the answer is given, the only limitation on the admissibility of a particular question under the *Edwards* rule is the judge's ability or willingness to conceive of a possible response that would reveal legally cognizable bias." (*Id.* at p. 399.)

Since "direct and general inquiries about juror bias cannot be expected to uncover all forms of partiality," the exclusion of questions from voir dire examination must be carefully examined to determine whether the question could conceivably have elicited an answer showing any kind of bias. (29 Cal.3d at p. 401.) The California Supreme Court examined the excluded questions to determine whether the inquiries had been improperly disallowed. The question about a prospective juror's ability to conceive of a hypothetical reasonable man was deemed properly excluded. "The question bears little potential for exposing prejudice or resistance to application of the law." (*Id.* at pp. 410-411.) On the other hand, as to the question about self-defense and the retreat rule, "[b]ecause the inquiry foreclosed by the [trial] court bore a substantial likelihood of uncovering jury *bias*, the court abused its discretion by refusing to allow the proposed question." (*Id.* at p. 412, italics added.)

Apparently applying a *Watson*[3] standard of prejudice, the California Supreme Court found it likely that the result would have been different had the jurors been adequately examined to assure that they bore no bias relating to the retreat rule and therefore reversed defendant's conviction. (*People* v. *Williams, supra*, 29 Cal.3d at pp. 411-412, 415-416 (Richardson, J. dis.).) Nevertheless, "[b]ecause of prior judicial reliance on *Edwards*, the rule we adopt herein applies to the defendant in the case at bar, but is otherwise limited to voir dire proceedings conducted after the present decision becomes final." (*Id.* at p. 412 fn. 15.)

Implicit in *Williams* is the assumption that restriction of voir dire in support of peremptory challenges does not violate the United States Constitution. The court's application of a *Watson* rather than a *Chapman*[4] standard for addressing the harmfulness of the error presumes that the error was a violation of state law. Furthermore, the state law basis for the error found in *Williams* was not constitutional but, instead, of legislative creation. In reaching its holding, *Williams* expressly relied on legislative pronouncements of a "commitment" to broad voir dire examination. (29 Cal.3d at pp. 399-400,

---

[3]*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].

[4]*Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].

408-409.) Since the decision in *Williams* was based on the then existing statutory scheme, little vitality remains in its holding after the voters' enactment of an entirely new statutory scheme in Proposition 115. Code of Civil Procedure section 223, the statute herein challenged, statutorily over-rules *Williams*. *Williams*, not being based on the state or federal Constitution, cannot survive the voters' statutory disavowment of its holding. ▪ Accordingly, Code of Civil Procedure section 223 is itself valid unless it violates the equal protection guarantees of the state and federal constitutions.

## 2. *No Equal Protection Violation*

▪ The equal protection clause of the Fourteenth Amendment to the United States Constitution denies states "the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute." (*Reed v. Reed* (1971) 404 U.S. 71, 75-76 [30 L.Ed.2d 225, 229, 92 S.Ct. 251].) The equal protection guarantee of article I, section 7 of the California Constitution, while substantially similar to that of the Fourteenth Amendment, has independent meaning and may, in some cases, provide broader rights than those granted by the federal Constitution. (*Serrano v. Priest* (1976) 18 Cal.3d 728, 764-765 [135 Cal.Rptr. 345, 557 P.2d 929].)

"The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner." (*In re Eric J.* (1979) 25 Cal.3d 522, 530 [159 Cal.Rptr. 317, 601 P.2d 549].) " 'To ask whether two groups are similarly situated in this context . . . is the same as asking whether the distinction between them can be justified under the appropriate test of equal protection.' " (*Laupheimer v. State of California* (1988) 200 Cal.App.3d 440, 457 [246 Cal.Rptr. 82], quoting *Fullerton Joint Union High School Dist. v. State Bd. of Education* (1982) 32 Cal.3d 779, 798 fn. 19 [187 Cal.Rptr. 398, 654 P.2d 168].)

The first step in analyzing any equal protection claim is to determine the applicable standard of scrutiny. Where the right affected by the classification is not constitutionally protected, the classification need only be rationally related to a legitimate state purpose in order to withstand equal protection scrutiny. (*Lucas v. Superior Court* (1988) 203 Cal.App.3d 733, 738 [250 Cal.Rptr. 76].) ▪ As discussed above, the right to voir dire in support of peremptory challenges and the right to exercise peremptory challenges are not constitutionally protected but are only statutory creations. Consequently, the relevant standard of scrutiny is rational basis.

Code of Civil Procedure section 223 applies only to criminal proceedings. By so limiting its scope, it distinguishes between criminal and civil jury trials and therefore between criminal and civil litigants. It is this distinction which is challenged as a violation of equal protection. Thus, it is necessary to determine whether the distinction drawn between criminal and civil litigants and proceedings is rationally related to a legitimate state purpose served by this statute. Substantial distinctions exist between criminal and civil jury trials. In every criminal trial, the state is a party, acting for the protection of the people of the state, while a civil trial involves a private dispute which one of the parties has chosen to litigate in the forum provided by the state for such actions. (Pen. Code, § 684.) However, this distinction does not directly relate to the purposes of the statute at issue here.

The California Supreme Court has held that "a greater possibility that the right conferred by the statute would be abused" is a reason sufficient to justify granting civil litigants the right to peremptorily challenge a trial judge while withholding that right from criminal litigants. (*Johnson* v. *Superior Court* (1958) 50 Cal.2d 693, 699-700 [329 P.2d 5].) Code of Civil Procedure section 170.6 originally allowed civil litigants, but not criminal litigants, to peremptorily challenge a trial judge. (50 Cal.2d at p. 701.) Petitioners in *Johnson* were plaintiffs in a civil action. They filed the requisite motion to disqualify the judge under Code of Civil Procedure section 170.6. The presiding judge denied the motion apparently in violation of the statute. The plaintiffs then sought a writ of mandate to compel the assignment of another judge. (50 Cal.2d at p. 695.) Respondents argued that Code of Civil Procedure section 170.6, "because it applies only to a 'civil' action or special proceeding, discriminates against parties in criminal cases in violation of federal and state constitutional provisions prohibiting unreasonable classifications. (U.S. Const., Fourteenth Amendment; [former] Cal. Const., art. I, §§ 11, 21; art. IV, § 25.)" (50 Cal.2d at p. 699.)

The California Supreme Court rejected this equal protection challenge. "The rights of parties in civil and criminal trials are, of course, different in many respects . . . . Wide discretion is vested in the Legislature as to the making of a classification, and every presumption is in favor of validity; the decision of the Legislature as to what constitutes a sufficient distinction to warrant the classification 'will not be overthrown by the courts unless it is palpably arbitrary and beyond rational doubt erroneous.' (*State* v. *Industrial Acc. Com.*, 48 Cal.2d 365, 371 [310 P.2d 7]; *Dribin* v. *Superior Court*, 37 Cal.2d 345, 351 [231 P.2d 809, 24 A.L.R.2d 864].) In enacting [Code of Civil Procedure] section 170.6, the Legislature could have concluded that, in criminal cases, there would be a greater possibility that the right conferred by the statute would be abused, and it cannot be said that this distinction was insufficient to justify withholding the right as to such cases." (50 Cal.2d at

pp. 699-700.) The court concluded that the statute's distinction between criminal and civil proceedings was rationally related to a legitimate state interest and therefore was not unconstitutional. (*Ibid.*)

The potential for greater abuse, recognized in *Johnson* as sufficient to uphold a distinction between criminal and civil proceedings with respect to a statutory right, is equally applicable to the distinction made in Code of Civil Procedure section 223. "[T]he purpose of [Penal Code, former section 1078, which governed voir dire in criminal cases], of course, being to expedite the trial of criminal causes, and to correct *the abuse which has grown up in this jurisdiction, through tedious and unnecessary examination of prospective jurors in criminal cases. It has become a matter of common knowledge in this state that the efforts on the part of counsel for defendants in criminal cases have developed into attempts to disqualify jurors, rather than to seek to ascertain their qualifications.*" (*People* v. *Estorga* (1928) 206 Cal. 81, 84 [273 P. 575], italics added.) Thus, the California Supreme Court explicitly recognized in *Estorga* that the voir dire process was being abused *in criminal cases* and that these abuses were a matter of common knowledge. (*Ibid.*) Consequently, it is not mere speculation for us to conclude that the voters could have recognized both the existence of, and greater potential for, abuse of the voir dire process in criminal cases and decided that correction of this abuse required restrictions on voir dire in criminal cases.

*Johnson* established that the prevention of abuse of a statutory right is a legitimate state purpose. *Estorga* recognized that the voir dire process was particularly subject to abuses in criminal cases where voir dire was tediously and unnecessarily prolonged for improper purposes. By enacting Code of Civil Procedure section 223, the voters took a step towards preventing those abuses. The voters' action was aimed at achievement of a legitimate purpose rationally related to the distinction made by the law. Hence, we are unable to say that the basis for the distinction was irrational. Since the classification drawn by Code of Civil Procedure section 223 is rationally related to a legitimate state purpose, it does not violate defendant's right to equal protection under the California and United States Constitutions.

## B. *Photo Identification Procedure*

Defendants brought *in limine* motions to exclude evidence of a prearrest photographic identification due to the alleged suggestive nature of the identification procedure.[5] An extensive evidentiary hearing was held to inquire into the circumstances surrounding the identification to determine

---

[5]Prior to the trial court ruling on their *in limine* motion, defendants, for tactical reasons, withdrew the portion of their motion which sought a ruling on whether the eyewitnesses' trial

whether it was unduly suggestive. After hearing the evidence and arguments, the court ruled that the photo identification procedure was not unduly suggestive. Three of the four eyewitnesses testified at trial about the prearrest photographic identification.

## 1. *Standard of Review*

██ A determination as to whether a pretrial photographic identification procedure violated due process requires the court to first decide whether the identification procedure was impermissibly suggestive. It is only where the procedure was unduly suggestive that the court proceeds to determine whether the suggestiveness of the pretrial identification indicates that there is a substantial likelihood of irreparable misidentification. (*Stovall* v. *Denno* (1967) 388 U.S. 293, 302 [18 L.Ed.2d 1199, 1206, 87 S.Ct. 1967]; *Neil* v. *Biggers* (1972) 409 U.S. 188, 198-199 [34 L.Ed.2d 401, 410-411, 93 S.Ct. 375]; *People* v. *Blair* (1979) 25 Cal.3d 640, 659 [159 Cal.Rptr. 818, 602 P.2d 738]; *People* v. *Hawkins* (1970) 7 Cal.App.3d 117, 124-125 [86 Cal.Rptr. 428].)[6]

In evaluating the fairness of a challenged identification procedure, the trial court should look at the totality of the circumstances including any statements by the officer conducting the procedure to the witnesses, the physical setting for the identification, the nature of the subject matter displayed to the witnesses for identification purposes and the amount of time elapsed between the offense and the identification. (*Manson* v. *Brathwaite* (1977) 432 U.S. 98, 114 [53 L.Ed.2d 140, 154, 97 S.Ct. 2243]; *People* v. *Sanders* (1990) 51 Cal.3d 471, 508 [273 Cal.Rptr. 537, 797 P.2d 561]; *People* v. *Martinez* (1989) 207 Cal.App.3d 1204, 1219 [255 Cal.Rptr. 691]; *People* v. *Sequeira* (1981) 126 Cal.App.3d 1, 12-13 [179 Cal.Rptr. 249].)

The trial court found that the photos presented to the witnesses for identification were of persons similar in appearance so as to "clearly provide

---

identifications had a basis independent from the challenged photographic identification. Three of the four eyewitnesses testified at trial. Defendants did not object to the prosecution's elicitation of testimony from each of these eyewitnesses about the pretrial photographic identification.

[6]Defendants normally bear the burden of proving that the identification procedure was suggestive. (*People* v. *Rodriguez* (1970) 10 Cal.App.3d 18, 30 [88 Cal.Rptr. 789]; *People* v. *Hawkins, supra,* 7 Cal.App.3d at p. 122.) However, where defendant objects to the admission at trial of evidence of a pretrial identification, some courts have held that the prosecution bears the burden of demonstrating the foundational fairness of the pretrial photographic identification. (*People* ex rel. *Younger* v. *Superior Court* (1978) 86 Cal.App.3d 180, 190 fn. 8 [150 Cal.Rptr. 156]; *People* v. *Vanbuskirk* (1976) 61 Cal.App.3d 395, 401-402 [132 Cal.Rptr. 30]; *People* v. *George* (1972) 23 Cal.App.3d 767, 774 [100 Cal.Rptr. 427].) We need not address the issue of who has the burden of proof as to the fairness of the identification because the parties have not raised the issue and it does not affect our finding that the trial court's determination was supported by substantial evidence.

a good representation from which to select any one individual." Although four of the six photos were of suspects, none of the witnesses observed more than two of the robbers sufficiently during the offense to identify them. Thus the fact that no single witness was able to identify more than two photos lent further credence to the fairness of the identification procedure. The officer conducting the identification procedure told the witnesses nothing other than that the witnesses were to indicate if they recognized any of the people in the · photographs. Although all the witnesses were in the same room at the time of the identification, each witness made his identification alone and there was no discussion with or observation by any witness of another witness's identification.

The trial court therefore determined that the pretrial photographic identification procedure was not suggestive. ▉ A trial court's finding that an identification procedure was not suggestive "will be sustained if supported by any substantial evidence, direct or indirect, contradicted or uncontradicted." (*People* v. *Hawkins, supra*, 7 Cal.App.3d at p. 122; accord *People* v. *Guillebeau* (1980) 107 Cal.App.3d 531, 556 [166 Cal.Rptr. 45].) Whether the trial court's factual findings can support a legal conclusion that the identification procedure was fair is, however, a question of law.

▉ The trial court's factual findings provide ample support for a legal conclusion that the identification procedure was fair. The officer conducting the procedure made no suggestive comments, the witnesses did not observe each others' identifications, the photographs depicted persons with similar physical characteristics and the witnesses' identifications were consistent with their observations at the time of the offense. Furthermore, the identification took place only 10 days after the offense, when the witnesses' observations of the robbers were still fresh in their minds. On these facts, we must conclude that the photographic identification procedure was fair. Nevertheless, in order to justify our reliance on the trial court's factual findings, we must review the evidence presented at the *in limine* hearing to verify that the court's findings were supported by substantial evidence.

### 2. *Circumstances of the Photographic Identification*

#### a. *Buck's Testimony*

Officer Larry Buck testified that he was assigned to investigate the robbery of the Miyake Restaurant in Palo Alto. Ten days after the robbery he conducted a photographic identification at the police station. Officer Buck contacted Mr. Yukio Iwamoto, the owner of the restaurant which had been robbed, and asked him to bring the four eyewitnesses, Iwamoto's employees,

to the police station to view a lineup of weapons.[7] Buck did not advise Iwamoto or the witnesses in advance that there would be a photographic identification. Iwamoto brought the four employees, Akiro Nakamura, Kikuo and Hiroshi and Moriyuki Nagayama, to the police station.

The witnesses were taken into a holding area for the photographic identification. Andrew Liu, a former employee of the restaurant, had already been arrested in connection with the robbery. Liu had provided the police with the names of four persons he claimed were with him on the night of the robbery. Buck obtained photographs of these four individuals and one "filler" photo from the San Francisco police. He tried to find additional "filler" photographs of nonsuspect Asians but didn't obtain any. He also took a photo of Liu and placed it with the other photographs. The photographs accumulated by Buck depicted six Asian males who appeared to be approximately twenty years old with straight black hair, broad noses, small eyes and similar skin tone. Overall the individuals pictured were of substantially similar appearance.

Buck had the witnesses sit on a bench along one wall of the room. He placed the photographs flat atop a small four-foot high cabinet. One at a time, he asked the witnesses to approach the cabinet to view the photo lineup. Iwamoto acted as translator for the witnesses since they did not speak English. Through Iwamoto, Buck asked each of the four witnesses to view the photographs and point out to him any photo the witness recognized. While each witness was viewing the photo array, the other witnesses remained seated on a bench approximately eight feet away from the cabinet upon which the photo array lay.

Buck observed that each witness placed his hand on the photos so that the area below the photographed subject's nose was obscured. Iwamoto would tell Buck that the witness recognized a particular photo and the witness would point to the photo. Each witness identified at least one photo. Buck failed to document which photos were identified by which witnesses or how many photographs were identified by each witness. Iwamoto told Buck that the four witnesses had collectively recognized five of the photos. The entire procedure took approximately three to five minutes. The witnesses were separately shown several weapons and a leather jacket for identification purposes.

### b. Other Testimony

Iwamoto accompanied his four employees to the police station on January 10, 1990. He was not told that anyone had been arrested in connection with

---

[7]During his testimony, Buck referred to Iwamoto as "Yuki." Apparently Buck had confused Iwamoto's last name with his first name. The parties stipulated that the person referred to as "Yuki" was actually Iwamoto.

the robbery or that the witnesses would be shown any photographs. Neither Iwamoto nor the witnesses knew that Liu had been arrested. The first thing that happened at the police station was that the witnesses were shown a group of photos. Buck placed some photos on top of a cabinet. Buck requested that Iwamoto ask each witness if he had ever seen the people in the photos. The witnesses were asked if they remembered having seen anyone in the photos before. Buck did not say that any of the people in the photos had been involved in the robbery nor did he mention Liu. While each witness was viewing the photos, the rest of witnesses sat on a bench about 13 feet away. The witnesses did not speak with one another while they were in the room viewing the photos. After viewing the photos, the witnesses viewed some weapons and clothing.

At the photo identification, Hiroshi and Moriyuki Nagayama each selected two of the photos they were shown. These two photos depicted David Leung and Michael Chan. Akira Nakamura also identified two photos. The photos he pointed out were of Jeffrey Leung and David Leung. None of the witnesses saw a photo of Liu among the photos shown to them by Buck. The witnesses expressed some disagreement over the number of photos shown to them with their estimates ranging from three to five.

### 3. *Identification Procedure Was Fair and Nonsuggestive*

While the evidence revealed certain inconsistencies, it was sufficient to support the trial court's conclusion, based on factual findings supported by substantial evidence, that the procedure was fair and nonsuggestive. Buck, Iwamoto and the witnesses testified that Buck made no suggestive comments and that the witnesses did not observe each others' identifications.

██ "It is also settled that a photographic identification is sufficiently neutral where the persons in the photographs are similar in age, complexion, physical features and build . . ." (*People* v. *Holt* (1972) 28 Cal.App.3d 343, 350 [104 Cal.Rptr. 572].) ██ Since all of the photographs depicted persons with similar physical characteristics, even if only four or five photographs were shown to each witness, there would have been a representative sampling from which a witness could identify the two suspects he had seen. The identification of two suspects by each witness was consistent with the witnesses' observations at the time of the offense. Hence the photographic identification procedure was fair and not suggestive. Evidence of the witnesses' prearrest photographic identification of defendants could therefore be introduced at trial in addition to courtroom identifications of defendants.

## C.   *Sentencing*

Each defendant asserts that the trial court erroneously imposed consecutive terms. Defendant Chan also claims that the trial court erroneously denied probation and imposed the middle rather than the mitigated term. Because their arguments differ significantly, we address their contentions separately.

### 1.   *Jeffrey Leung*

Defendant Jeffrey Leung asserts that the trial court erred in imposing consecutive terms because "it was unaware of its discretion not to impose consecutive sentences . . ."

#### a.   *Sentencing Proceedings*

For a host of proper reasons, the court denied probation. The court then selected the midterm for count I, imposed a one-year consecutive term for the personal use enhancement, stayed the arming enhancement and imposed consecutive one-third the midterm sentences for counts II, III and IV. "I am *selecting* the consecutive sentences for each of the counts in Counts Two, Three, and Four in view of the fact that there were separate victims, each of whom suffered a separate loss and separate harm." (Italics added.) Sentence on counts V, VI, VII and VIII and the enhancements related thereto were stayed pursuant to Penal Code section 654. The court also imposed two consecutive five-year enhancements pursuant to Penal Code section 667 resulting from Jeffrey's admission of two prior convictions. A total term of 16 years and 8 months in state prison was imposed.

#### b.   *Analysis*

Jeffrey argues that the court's use of the word "mandates" in sentencing *the other defendants* indicates that the court was unaware of its discretion to sentence him to concurrent rather than consecutive terms. This contention is meritless. In sentencing Jeffrey Leung, the court noted that it was *selecting consecutive terms for a particular reason.* "Select" means to make a choice. (Webster's 9th New Collegiate Dict. (1983) p. 1064.) A discretionary act is one which involves judgment and choice. (Black's Law Dict. (1979) p. 467.) The trial court's statement that it was "selecting" consecutive terms evidenced that it was aware of its discretion to make a different disposition. Furthermore, had the court believed that consecutive terms were mandatory, it would not have stated reasons for their imposition since none would have been required. The trial court's awareness of its

discretion to sentence any of the defendants to concurrent rather than consecutive terms is manifestly shown by the record. As Jeffrey Leung makes no other contentions, the judgment against him is affirmed.

### 2. David Leung

Defendant David Leung argues that the trial court erred in imposing consecutive sentences because it "utilized inappropriate and inapplicable factors in making its sentence choice of consecutive terms . . ."

#### a. Sentencing Proceedings

Probation was denied and the aggravated term was imposed. The court stated numerous reasons for each of these choices. The court then imposed consecutive one-third the midterm sentences for counts II, III and IV. "They were separate offenses, separate victims, each of whom suffered separate losses and being armed. The separateness of those offenses mandates there be consecutive sentences imposed . . ." (Italics added.) The court imposed a two-year consecutive term for the personal use enhancement pursuant to Penal Code section 12022.5. The arming enhancement under Penal Code section 12022, subdivision (a) was stayed. Sentence on counts V, VI, VII and VIII, and the enhancements related thereto were stayed pursuant to Penal Code section 654. A total sentence of nine years eight months in state prison was imposed.

#### b. Analysis

David argues that the counts for which consecutive terms were imposed did not involve separate offenses, separate victims or separate losses because the offenses took place at the same time and place and no single count charged defendant with an offense against more than a single victim. Instead, David contends that the crimes were all part of a single episode of aberrant behavior such as would preclude a finding that the offenses were temporally or spatially separate. (Cal. Rules of Court[8], rule 425(a)(3).) He therefore concludes that the trial court's utilization of the circumstance of multiple victims as a justification for imposing consecutive terms was invalid.

In *People* v. *Humphrey* (1982) 138 Cal.App.3d 881 [188 Cal.Rptr. 473], the Third District concluded that the multiple victims factor set forth in rule 425(a)(4) was inapplicable where defendant was convicted of two counts of

---

[8]All further rule references are to the California Rules of Court.

robbery, each of which involved only a single victim.[9] (138 Cal.App.3d at pp. 882-883.) "[W]e find the rule applies only to a situation where a defendant is convicted of two or more counts or crimes and at least one of those counts involves multiple victims." (138 Cal.App.3d at p. 882.)

In *Humphrey*, Justice Regan of the Third District declined to follow the opinion he had authored in *People* v. *Fowler* (1980) 109 Cal.App.3d 557 [167 Cal.Rptr. 235]. Fowler had been convicted of driving under the influence and two counts of vehicular manslaughter. Refusing to accept a restrictive interpretation of the multiple victims factor that would preclude its use where multiple crimes of violence arose out of the same transaction, the court held that the circumstance of multiple victims could be used in such cases to justify the imposition of consecutive terms. In his one paragraph analysis of this issue in *Humphrey*, Justice Regan rejected *Fowler* as a misinterpretation of the sentencing rule. Since the Rules of Court are propounded for the guidance rather than the restriction of trial courts and are not exclusive statements of the criteria applicable to sentencing choices, the "statutory interpretation" analysis engaged in in *Humphrey* (cf. *People* v. *Humphrey, supra,* 138 Cal.App.3d at p. 883.) was inappropriate. (rule 408.) As we shall explain, *Humphrey*'s rejection of *Fowler* was ill-advised, since *Fowler* cogently analyzed and resolved the issue. The Third District, nevertheless, reaffirmed *Humphrey* in *People* v. *Coulter* (1983) 145 Cal.App.3d 489 [193 Cal.Rptr. 476]. The Second District joined suit in *People* v. *Levitt* (1984) 156 Cal.App.3d 500 [203 Cal.Rptr. 276]. "[S]entences cannot be made consecutive on the basis of multiple victims if, as here, there is but one victim per count." (156 Cal.App.3d at p. 517.)

Universal agreement was not, however, achieved. In *People* v. *Birmingham* (1990) 217 Cal.App.3d 180 [265 Cal.Rptr. 780], the Fourth District, citing *Coulter*, determined that " '[m]ultiple victims' refers to multiple victims of a single crime *or crimes committed during a single transaction.*" (217 Cal.App.3d at p. 185, italics added.) Because "the two crimes occurred in a single transaction," the court found that the multiple victims factor was a proper reason for imposing consecutive terms. (217 Cal.App.3d at p. 185.) We rejected *Coulter* in *People* v. *Blade* (1991) 229 Cal.App.3d 1541 [281 Cal.Rptr. 161].

---

[9]*Humphrey* relied upon *People* v. *Lawson* (1980) 107 Cal.App.3d 748 [165 Cal.Rptr. 764]. In *Lawson*, the Fifth District noted that the multiple victims factor set forth as an aggravating circumstance in rule 421 was inapplicable *for the purpose of imposing an aggravated term for a particular offense* where the individual offense for which the court sought to utilize that factor involved only a single victim. *Lawson* did not compel the result in *Humphrey* because *Lawson* properly found that the fact that multiple victims were involved in a group of offenses did not aggravate an individual offense. This does not affect the problem herein posed which is whether the fact that multiple victims were involved in a group of offenses makes the group of offenses distinctively worse than if they had been committed against a single victim.

In 1991, the "multiple victims" factor was removed from rule 421's list of aggravating circumstances as a result of confusion over its meaning. The factor had apparently been frequently misapplied to aggravate an offense committed against a single victim. (Advisory Com. Comment, rule 421.) At the same time, the Judicial Council, without comment, removed the "multiple victims" factor from rule 425's list of criteria relevant to the imposition of consecutive terms.

Our task is to determine whether the fact that there were multiple victims of defendant's offenses is an aggravating circumstance which can be utilized as a justification for imposing consecutive terms. "The essence of 'aggravation' relates to the effect of a particular fact in making the offense distinctively worse than the ordinary." (*People v. Moreno* (1982) 128 Cal.App.3d 103, 110 [179 Cal.Rptr. 879]; accord *People v. Young* (1983) 146 Cal.App.3d 729, 734 [194 Cal.Rptr. 338].) In choosing between consecutive and concurrent terms, the court must decide whether the particular circumstance at issue renders the collective group of offenses distinctively worse than the group of offenses would be were that circumstance not present.

The choice between concurrent and consecutive terms arises only where the defendant had been convicted of multiple offenses. To determine whether the existence of multiple victims merits the imposition of consecutive terms, the court must compare between the gravity of (1) multiple offenses being committed against a single individual and (2) multiple offenses being committed against multiple individuals. If multiple offenses against multiple individuals is "distinctively worse" than multiple offenses against a single individual, the existence of multiple victims is a circumstance which justifies the imposition of consecutive terms.

We believe that multiple offenses committed against multiple individuals are distinctively worse than multiple offenses committed against a single individual. Offenses against persons, such as robberies or rapes, are crimes which, by their nature, are significantly more serious when they are committed against more than one person. The total impact of singular offenses against different victims will generally exceed the total impact on a single individual who is victimized multiple times. Furthermore, the culpability of the defendant who victimizes multiple individuals is greater than the culpability of a defendant who victimizes a single individual.

With respect to multiple sex offenses, the Legislature has statutorily recognized that multiple sex offenses committed on separate victims (or on the same victim on separate occasions) are distinctively worse than multiple offenses committed on a single victim on a single occasion. (Pen. Code,

§ 667.6.) The Legislature has therefore mandated full term consecutive sentences for multiple sex offenses on multiple victims but has made such sentences discretionary where the multiple offenses were committed on a single victim on a single occasion. (Pen. Code, § 667.6.) The Legislature's view, expressed in Penal Code section 667.6, that multiple offenses committed on multiple victims should receive more severe punishment than multiple offenses committed on one victim acknowledges that the more severely punished group of offenses are "distinctively worse" than the less severely punished group of offenses.

While Penal Code section 667.6 is a special sentencing scheme applicable exclusively to sex offenses, the rationale upon which it is based is that a punitive distinction should be drawn between multiple offenses against multiple individuals and multiple offenses against a single individual. We find support therein for our conclusion that the existence of multiple victims of a group of crimes against individual persons is a factor which makes the group of offenses distinctively worse and therefore justifies the imposition of consecutive terms. Hence the existence of multiple victims of the group of crimes at issue in this case justified imposing consecutive terms.

### 3. *Michael Chan*

Defendant Chan asserts that the trial court erred in (1) denying probation and imposing the middle term for the principal offense and (2) imposing consecutive terms for the subordinate offenses.

#### a. *Sentencing Proceedings*

"I'm going to deny probation in this matter. The nature and seriousness and circumstances of the crime, the defendant's absolute lack of remorse of any kind, his unwillingness to accept responsibility for conduct which has been overwhelmingly, in the court's mind, established. [¶] I find that the planning, sophistication, premeditation involved in this crime mandates that he not be given probation. [¶] As to the seriousness of the offense, I do not believe he would be a good risk for probation. I believe he's a danger to the community as a result of his readiness to become involved in crimes such as this. [¶] In view of the defendant's age I am going to select the midterm in this case as well as the fact that he was not as major a player as the other two defendants, according to the testimony that the court heard in this case." The court imposed the middle term for count I and a one-year arming enhancement pursuant to Penal Code section 12022, subdivision (a)(1). Consecutive one-third the middle term sentences were imposed for counts II, III, and IV. "They were separate offenses, separate victims, each of whom suffered

separate losses and being armed. The separateness of those offenses mandates there be consecutive sentences imposed . . ." Sentence on counts V, VI, VII, and VIII and the enhancements related thereto were stayed pursuant to Penal Code section 654.

### b.  *Denial of Probation and Imposition of Midterm Proper*

Chan attacks three of the factors set forth by the trial court as supporting its denial of probation and imposition of the middle term: Chan's danger to others; the planning, sophistication and premeditation involved in the offense; and lack of remorse. (former Rule 414(b), (c)(7) and (d)(9).) He argues that there was insufficient evidence to support a finding that he was a danger to others or that he had participated in the planning of the offenses. In addition, he argues that lack of remorse is not properly applied to a defendant who denies his guilt even after conviction.

Where the defendant is eligible for probation, the court must state its reasons for selecting a prison commitment as its sentencing choice. This obligation to state reasons is satisfied by an explanation of why probation has been rejected in favor of imprisonment. (*People* v. *Romero* (1985) 167 Cal.App.3d 1148, 1151 [213 Cal.Rptr. 774]; *People* v. *Crouch* (1982) 131 Cal.App.3d 902, 904 [182 Cal.Rptr. 701]; Pen. Code, § 1170, subd. (c); former rule 439(d).) The circumstances utilized by the trial court to support its sentencing choice need only be established by a preponderance of the evidence. (*People* v. *Lewis* (1991) 229 Cal.App.3d 259, 264 [280 Cal.Rptr. 128]; former rule 439(b).)

Chan argues that he was only minimally involved in the offenses and had no role in the planning of the robberies. Consequently, he asserts that the "planning, sophistication and premeditation" factor was inapplicable to him. The evidence at trial established that Chan entered the kitchen where David Leung had two victims at gunpoint with their hands up. Chan was wearing a handkerchief over the lower portion of his face to obscure his identity. David Leung and Chan forced the two victims to go to the basement. Left alone with the victims, Chan demanded money from them and took money from the only one who had any. He then ordered the victims to remain in the basement and not to move.

This evidence was sufficient to support the trial court's determination that Chan had participated in the premeditation and planning of the crimes and had contributed to the fairly sophisticated nature of the offenses. The offenses took place in the wee hours of the morning. Chan and the others wore masks. The victims were taken to a basement at gunpoint and relieved

of their possessions. Chan implicitly threatened them by warning them not to move. Chan's knowledge of and participation in the group's plan for the robberies was thereby evidenced. Because the trial court could have found that these circumstances aggravated the nature of the crimes, this factor was applicable to defendant Chan.

The trial court also found that Chan posed a danger to others. Chan argues that there was "minimal" evidence that he was dangerous to others. Chan had one prior adjudication as a juvenile for a burglary occurring approximately 18 months prior to the current offenses. He had been granted probation and had (apparently) successfully completed probation about nine months prior to the current offense. As the court explained, Chan's pattern of conduct exhibited a "readiness" to become involved in crimes of this type. His prior adjudication was evidence that he had not been deterred from committing future crimes by a grant of probation with respect to the earlier matter. Notwithstanding his recent experience with the law, Chan had progressed to participating in armed robberies. Armed offenses involve serious danger to the safety of others. The court could therefore have concluded that defendant's conduct posed a danger to others which militated against a grant of probation.

Chan's final attack is on the trial court's reference to lack of remorse. ▮▮▮▮▮ Whether a defendant is remorseful is a proper consideration with respect to probation. (Rule 414(d)(9).) ▮▮▮▮▮ Chan asserts that this factor was inapplicable to him because he did not admit that he had committed the offenses and the evidence was not overwhelming. ▮▮▮▮▮ "Lack of remorse may be used as a factor to aggravate under California Rules of Court, rule 408 unless the defendant has denied guilt *and* the evidence of guilt is conflicting." (*People* v. *Holguin* (1989) 213 Cal.App.3d 1308, 1319 [262 Cal.Rptr. 331], italics added.)

▮▮▮▮▮ While Chan denied guilt, the trial court determined that the evidence was overwhelming. We agree. Two eyewitnesses, whom the trial court found to be extremely credible, positively identified Chan as one of the robbers and described in detail his role in the crimes. Chan's defense consisted of an extremely weak alibi witness. His cousin testified that Chan had been watching a video with him at his San Francisco home at the time of the robberies. On cross-examination, the cousin claimed that, although he became aware of the date and time of the robbery soon after Chan's arrest, he did not come forward with his alibi story earlier because "I go to school. I don't have time to."

We are convinced, as was the trial court, that the evidence overwhelmingly established Chan's guilt. Lack of remorse is properly utilized as a

reason for denying probation even when the defendant does not admit his guilt where, such as in this case, the evidence of guilt is overwhelming. The court's use of the lack of remorse factor was not error.

Chan argues that the trial court should not have imposed the middle term. The trial court must impose the middle term unless it finds circumstances mitigating or aggravating the offense. (Pen. Code, § 1170, subd. (b).) After noting all the aggravating factors supporting its denial of probation, the court explained that Chan's age and reduced level of involvement in the crime were mitigating factors. Impliedly, the court then balanced the four aggravating and two mitigating factors and determined that neither the upper nor the lower term was justified. We see no abuse of discretion. The court would have been justified in imposing the aggravated term since the aggravating factors outnumbered, and could have been found to outweigh, the mitigating factors. The middle term need not be additionally justified. The trial court did not err.

### c. *Consecutive Sentences*

Chan incorporates the arguments of the other two defendants as to the propriety of the trial court's imposition of consecutive sentences. Since, as we have explained, the court was aware of its discretion to impose concurrent rather than consecutive terms and the court's decision to impose consecutive terms was properly supported by the circumstance that the crimes involved multiple victims, consecutive sentences were properly imposed.

### D. *Clerical Errors*

Defendants point out that the abstracts of judgment incorrectly reflect that they were convicted of first degree rather than second degree robberies and attempted robberies. The jury found defendants guilty of second degree offenses. We therefore order the trial court to correct the abstracts of judgment to reflect that defendants were convicted of second degree robberies and attempted robberies.

Defendant David Leung asserts that he was granted fewer custody credits than he was entitled to. The Attorney General concedes that the abstract of judgment should be corrected. We therefore order the trial court to determine the correct number of custody credits to which defendant David Leung was entitled and to then amend the abstract of judgment to reflect the correct amount of custody credit.

### E. *Denial of Request for JRAD*

Defendant Michael Chan requested that the trial court make a judicial recommendation against deportation (JRAD). The court declined to

do so. Defendant now asserts that in doing so the trial court abused its discretion. The federal statute authorizing the issuance of JRAD's was repealed on November 29, 1990. (See 8 U.S.C. § 1251(b).) The law repealing the statute provided that it was applicable "to convictions entered before, on, or after [November 29, 1990]." (Pub.L. No. 101-649 (Nov. 29, 1990) § 505(b), 101 Stat. 5050.) Defendant was sentenced on November 21, 1990. Thus, even if we were to determine that the trial court abused its discretion in failing to issue a JRAD, a remand would be pointless since courts are no longer authorized to issue JRAD's. In *U.S.* v. *Murphey* (9th Cir. 1991) 931 F.2d 606, the Ninth Circuit determined that the repeal by Congress of the statutory authority for issuance of JRAD's rendered moot the issue of the propriety of a denial of a JRAD motion. We agree and therefore deem the issue moot.

## CONCLUSION

The judgments are affirmed. The abstracts of judgment are ordered modified by the trial court to reflect second degree robbery and attempted robbery convictions. The trial court is ordered to determine the number of days of custody credit to which David Leung is entitled and to amend David Leung's abstract of judgment to so reflect.

Elia, J., concurred.

**PREMO, J.,** Concurring.—I concur in the majority opinion in all respects, with the exception that under Discussion, section A, subtitled "Challenge to Code of Civil Procedure section 223," I concur in the result only. I would base my holding on the reasoning expressed in *People* v. *Boulerice,* ante, page 463 [7 Cal.Rptr.2d 279], filed simultaneously with this opinion.

Appellants' petition for review by the Supreme Court was denied June 18, 1992.