Filed 5/7/13  P. v. Montes CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E055481 |
| v. | (Super.Ct.No. FSB904566) |
| MICHAEL JAMES MONTES, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  J. David Mazurek, Judge.  Affirmed as modified.

Barbara A. Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Melissa Mandel and Scott C. Taylor, Deputy Attorneys General, for Plaintiff and Respondent.

1

## I. INTRODUCTION

Defendant Michael James Montes appeals from his conviction of two counts of second degree robbery for the benefit of a criminal gang (Pen. Code,[1] §§ 211, 186.22, subd. (b)(1)(C)) and two counts of dissuading witnesses for the benefit of a criminal gang (§§ 136.1, subd. (b)(1), 186.22, subd. (b)(4)(C)). Defendant contends (1) the evidence was insufficient to sustain his conviction on one of the counts of dissuading a witness, and (2) the trial court abused its discretion in denying probation based on factors largely inherent in the offenses charged. We find no error, and we affirm. However, on our own motion, we will direct that errors in the abstract of judgment and the minute order of the sentencing hearing be corrected.

## II. FACTS AND PROCEDURAL BACKGROUND

On October 17, 2009, D.V. went into the garage attached to his home in Colton. The garage door was open, and D.V. saw two men inside the garage and another two men outside.[2] Defendant, whom D.V. knew as "Red," was one of the men inside the garage. Defendant knew one of the other men as "Joe."[3]

---

[1] All further statutory references are to the Penal Code.

[2] Four men, defendant, Joseph Andrew Rios, Albert Martinez, and Gregorio Mario Olguin were named in the original complaint. The probation report indicates that codefendant Olguin (also referred to in the record as Holguin) was sentenced to three years' probation with 365 days in county jail; codefendant Martinez was sentenced to six years in state prison; and codefendant Rios was sentenced to six years eight months in state prison.

[3] Other evidence indicated defendant misidentified Albert Martinez as "Joe."

Defendant asked D.V. where his brother was and told him to call his brother. Defendant said the brother had taken some property from defendant's friend. D.V. called his brother on his cell phone, and defendant asked to speak to the brother. Defendant took D.V.'s cell phone, disconnected the call, and told D.V. he had been "jacked," meaning that defendant was not going to give the phone back. D.V. did not try to take back the phone because he was afraid the men would jump him.

D.V. testified that his friend, M.P., drove up and the group walked toward him. Defendant demanded M.P.'s stereo, wallet, and keys. Defendant pushed M.P. and punched him four or five times in the head with a closed fist. The man defendant identified as Joe warned D.V. not to help M.P.; Joe said he had a gun and put his hand under his shirt as if he was holding a gun. Defendant took M.P.'s wallet, keys, and stereo. One of the other men took D.V.'s watch, necklace, and bracelet. Joe said he was from Northside Colton, and if they called the police, they would be killed. When defendant was confronting M.P., D.V. was standing in front of the car with defendant's companions. Defendant said something to the effect of, "'My name is Red, Northside Colton. Remember that. And if you tell on me, I'm going to come back and kill you.'"

M.P. testified that when he drove up to D.V.'s house on October 17, 2009, he saw about five people outside; he recognized D.V., defendant, Martinez, and Rios. When M.P. parked the car, the group walked toward him. Defendant asked M.P. if M.P. remembered him, and M.P. said he did—they used to play on the same Little League baseball team and had gone to the same high school, but they were not friends. Defendant told M.P. to give defendant whatever he had in his pockets, and when M.P. did

3

not do so, defendant punched him in the face about five times, and M.P. fell back into his car. Defendant climbed into the car with him and punched him again in the face. M.P. did not fight back because he was scared. Defendant kept demanding that M.P. give him M.P.'s "'stuff.'" Eventually, M.P. complied and gave defendant his wallet, cell phone, and car stereo, and defendant grabbed his keys from the ignition. Meanwhile, D.V. was standing near the front of the car on the left side, and the other men were standing behind defendant. After M.P. gave his property to defendant, defendant asked if M.P. was going to tell on him. Defendant said, "'My name is Red, Northside Colton. Remember that. And if you tell on me, I'm going to come back and kill you.'" Defendant then punched D.V. and the group walked off. M.P. heard one of the other men say to D.V. that if D.V. tried anything, the man had a gun in his pants. M.P. suffered a bruised cheek in the incident.

When officers arrived, D.V. and M.P. pointed out some men down the street as the perpetrators. Officers went to the house where the suspects were seen, and the men went in different directions as the officers approached. Two men were found inside the house; Olguin was found hiding in a bedroom closet. The officers found a car stereo on a chair in the back yard of the house, and they found two cell phones and M.P.'s wallet and keys under some debris near the closet where Olguin was hiding.

D.V. and M.P. were brought to the scene where they viewed seven subjects. D.V. identified defendant and Martinez as two of the robbers; M.P. identified defendant, Rios, and Martinez as three of the robbers.

Because defendant does not raise any contention on appeal in connection with the gang allegations, we set forth the evidence supporting those allegations summarily: a gang expert testified that in his opinion, defendant was an active member of Northside Colton, a gang within the meaning of section 186.22, subdivision (b); the offenses were committed in Northside Colton territory for the benefit of the gang; and the crime served gang purposes. The expert further testified as to predicate gang crimes.

The jury found defendant guilty of second degree robbery (§ 211) in counts 1 and 2 and of dissuading a witness (§ 136.1, subd. (b)(1)) in counts 3 and 4, and found true a gang allegation (§ 186.22, subd. (b)(1)(C)) as to each count.

The trial court sentenced defendant to the middle term of three years for count 1, a consecutive term of one year for count 2, and a consecutive middle term of 10 years for the gang enhancement (§ 186.22, subd. (b)(1)(C)) attached to count 1. The trial court imposed consecutive indeterminate terms of seven years to life for each of counts 3 and 4 under the sentencing provisions of section 186.22, subdivision (b)(4)(C). The trial court stayed the gang enhancement (§ 186.22, subd. (b)(1)(C)) as to count 2.

## III. DISCUSSION

### A. Sufficiency of Evidence

Defendant contends the evidence was insufficient to sustain his conviction on the count of dissuading a witness involving D.V. He argues that on cross-examination, victim D.V. "disavowed" his testimony on direct that defendant had said he was from Northside Colton and that they would return and kill him if he called the police. He

5

further asserts there was no evidence to support his conviction on an aiding and abetting theory.

## 1. *Additional Background*

D.V. testified that "Joe" "said that he was from Northside Colton, and that was like later on during the whole incident. And then he said if we call the cops, that they'll end up killing me and him." The exchange continued:

"[The prosecutor] And Joe—who said that to you?

"A Joe and Red."

The prosecutor asked, "What did Joe say to you?" D.V. replied, "He said that, 'We know where you live and if you call the cops, we'll come and kill you.'" The prosecutor asked what defendant had said, and D.V. testified, "He said, 'I'm Red from Northside Colton'; and same thing about the cops and, 'We'll come and kill you.'" D.V. said that Joe had made the statement "[a]t the very end, after he—they stole my property and [M.'s]," and defendant had made his statement "[r]ight as soon as they were gonna leave."

On cross-examination, in discussing what D.V. had told the officer, the following exchange occurred:

"[Defendant's counsel] Didn't you tell this particular officer that all three subjects, not including Red, but another three subjects all stated they were from Northside Colton?

"A Yes.

"Q That if you tried anything that they would kill you?

6

"A  Yes.

"Q  You didn't tell this particular officer that Red made any kind of statement stating that he was from Northside Colton and that he would kill you if you told the police?  You didn't tell this officer that, did you?

"A  If it's not in the statement, I guess not.

"Q  Were you attempting to tell the officer everything that occurred to give a complete report.

"A  Yes."  D.V. confirmed that at the preliminary hearing, he had testified that one of the other men, not defendant, had said something like "if you call the cops, we'll kill you."  D.V. agreed that his memory of the events was better at the preliminary hearing.

On redirect, the following exchange occurred:

"[The prosecutor]  Now, you have previously testified that Red made a comment, 'I'm Red from Northside Colton.  If you call the p[olice], we'll kill you'; correct?

"A  Correct.

"Q  Is it your testimony here in court that Red made that statement or that he did not make that statement?

"A  In this court, I kind of remember that he did; and the last one I didn't, that he did."  When asked what he recalled defendant saying on the date of the incident, D.V. responded, "I don't know."

The officer who took the victims' statements the night of the crime testified that D.V. never told him "that he heard Red say to [M.P.] anything to the [e]ffect that, 'I am

7

Red, Northside . . . Colton.  We have your information and if you call the police, we're

gonna kill you.'"

### 2. *Standard of Review*

When a criminal defendant challenges the sufficiency of the evidence to support

his conviction, "'we review the entire record in the light most favorable to the judgment

to determine whether it contains substantial evidence—that is, evidence that is

reasonable, credible, and of solid value—from which a reasonable trier of fact could find

the defendant guilty beyond a reasonable doubt.'  [Citation.]"  (*People v. Avila* (2009) 46

Cal.4th 680, 701.)

### 3. *Analysis*

Defendant was convicted of the crime of dissuading a witness, defined as follows:

"(b) Except as provided in subdivision (c), every person who attempts to prevent or

dissuade another person who has been the victim of a crime or who is witness to a crime

from doing any of the following is guilty of a public offense and shall be punished by

imprisonment in a county jail for not more than one year or in the state prison:  [¶]

(1) Making any report of that victimization to any peace officer . . . ."  (§ 136.1, subd.

(b)(1).)

Defendant's argument that the evidence was insufficient is based on D.V.'s

equivocal testimony on cross-examination and the inconsistencies between defendant's

preliminary hearing testimony and trial testimony.  In short, defendant has merely

identified a conflict in the evidence.  Under the rules that govern our review, we resolve

the conflict in favor of the judgment below.  (*People v. Galvez* (2011) 195 Cal.App.4th

8

1253, 1259.) It was solely the province of the jury to weigh conflicts and inconsistencies in the witnesses' testimony and to evaluate the witnesses' credibility. (See, e.g., *People v. Young* (2005) 34 Cal.4th 1149, 1181.) We cannot reject the jury's findings on appeal unless the evidence on which the jury relied was physically impossible or inherently improbable. (*Ibid.*)

Although defendant argues that his direct testimony was "inherently unlikely" and "rang a false note," to warrant rejection of testimony as inherently improbable requires more than that there is a justifiable suspicion against it. In *People v. Ennis* (2010) 190 Cal.App.4th 721, the court explained: "The 'inherently improbable' standard for rejecting testimony on appeal is not merely an enhanced version of implausibility, as Ennis seems to be asserting. '*Highly* implausible' is still an argument reserved for the trier of fact. Inherently improbable, by contrast, means that the challenged evidence is 'unbelievable per se' (italics omitted), such that 'the things testified to would not seem possible.' [Citation.] The determination of inherent improbability must be made without resort to inference or deduction, and thus cannot be established by comparing the challenged testimony to other evidence in the case. [¶] Because Ennis's inherent improbability claim is based entirely on comparisons, contradictions and inferences, it amounts to nothing more than an attack on witness credibility, and cannot be the basis for a reversal of the judgment on appeal." (*Id.* at p. 725.)

Here, the jury was properly instructed it could "'believe all, part, or none of any witness's testimony,'" and among the factors to consider in evaluating testimony, the jury could consider whether "the witness ma[d]e a statement in the past that is consistent or

9

inconsistent with his or her testimony." The jury was instructed not to "automatically reject testimony just because of inconsistencies or conflicts," but to "[c]onsider whether the differences are important or not." The jury was instructed, "If you decide a witness deliberately lied about something significant in this case, you should consider not believing anything that witness says. Or, if you think the witness lied about some things, but told the truth about others, you may simply accept the part that you think is true and ignore the rest." The jury apparently chose to believe D.V.'s direct testimony rather than his conflicting accounts.

We conclude the evidence was sufficient to support defendant's conviction of both counts of dissuading a witness as a direct perpetrator. We therefore need not address defendant's argument concerning the lack of evidence to support an aiding and abetting theory.

## B. Denial of Probation

Defendant next contends the trial court abused its discretion in denying probation based on factors largely inherent in the offenses charged.

### 1. Additional Background

The probation report listed as factors relating to probation that defendant inflicted physical or emotional injury, the manner in which the crime was carried out demonstrated planning, criminal sophistication or professionalism, and defendant has not shown remorse. The probation report listed as factors in aggravation that the crime involved threat of great bodily harm or other acts disclosing a high degree of viciousness, cruelty, and callousness; the manner in which the crime was carried out showed planning,

10

sophistication, or professionalism; and defendant engaged in violent conduct, indicating a serious danger to society. The probation report recommended denial of probation.

At the sentencing hearing, defendant's counsel argued that because defendant, then age 21, had no prior adult record and only a misdemeanor in 2007 as a juvenile, the court should consider probation. The trial court responded: "Given the facts and circumstances of this; the fact that there were multiple victims involved; the fact that it was done in concert with other people; the fact that the defendant has demonstrated some criminal sophistication and professionalism, not only in the crime, but trying to cover up the crime, which was the robbery; and being involved in gangs, the Court doesn't think that probation is a viable alternative."

### 2. Forfeiture

The People contend defendant forfeited his claim of violation of sentencing rules concerning statements of reasons because he did not object in the trial court. Defendant disputes that contention, noting that his trial counsel provided letters to the trial court requesting any possible leniency, and his counsel argued at the sentencing hearing that the crime was not committed with criminal sophistication, and there was no physical injury. We will therefore address the issue on the merits.

### 3. Analysis

"[P]robation is 'an act of leniency, not a matter of right.' [Citation." (*People v. Birmingham* (1990) 217 Cal.App.3d 180, 185, superseded by statute on other grounds as stated in *People v. Leung* (1992) 5 Cal.App.4th 482, 503.) The trial court has broad discretion in determining whether or not to grant probation, and we review the trial

11

court's decision under the deferential abuse of discretion standard. (*People v. Groomes* (1993) 14 Cal.App.4th 84, 87.) A single aggravating factor may support the denial of probation. (*People v. Robinson* (1992) 11 Cal.App.4th 609, 615 [Fourth Dist., Div. Two], disapproved on another ground in *People v. Scott* (1994) 9 Cal.4th 331, 353 fn. 16.) The fact that the defendant committed crimes against multiple victims is a proper consideration in determining that the defendant did not merit probation. (*People v. Martinez* (1982) 135 Cal.App.3d 819, 824.)

Defendant relies on *People v. Read* (1990) 221 Cal.App.3d 685, in which the court erroneously found that the defendant was statutorily ineligible for probation, and the appellate court remanded for resentencing. (*Id.* at pp. 690-691.) The court further held that the defendant's offense did not, as the trial court had found, involve sophistication, planning or professionalism: "Even though appellant's bungled burglary was a second story break-in, there was no indication of professionalism, no sign of planning, and the sophistication with which it was carried out was questionable." (*Id.* at p. 691.) Here, however, the record indicated defendant was the lead actor in the robberies; he brought three accomplices, and he used the ruse of having D.V. call his brother to obtain D.V.'s cell phone. Under those circumstances, the trial court could properly find that the crime involved planning.

Moreover, even if the trial court used one improper factor for denying probation, defendant must demonstrate it is reasonably probable the trial court would have granted probation in the absence of that improper reason. (*People v. Weaver* (2007) 149

12

Cal.App.4th 1301, 1318-1319.) The trial court here stated it did not believe probation was a "viable alternative" for defendant in any circumstances.

### C. Sentencing Minute Order and Abstract of Judgment

The minute order for the sentencing hearing states that the trial court struck allegations under section 186.22, subdivision (b)(4)(C) as to counts 3 and 4. However, the reporter's transcript for the sentencing hearing reflects no such order; rather, the trial court sentenced defendant to seven years to life for each of those counts pursuant to the provisions of section 186.22, subdivision (b)(4)(C). We presume that the trial court's oral pronouncement is correct and that the written record reflects a clerical error. (See, e.g., *People v. Aegis Sec. Ins. Co.* (2005) 127 Cal.App.4th 569, 573.) In addition, the minute order states that the trial court imposed a consecutive seven-years-to-life enhancement for the gang allegations (§ 186.22, subd. (b)(1)(C)) as to each of counts 3 and 4 but stayed those enhancements under section 654. Again, the reporter's transcript for the sentencing hearing reflects no such order. On our own motion, therefore, we will order the trial court to correct its minute order. (*People v. Aegis Sec. Ins. Co.*, *supra*, at p. 573.)

In addition, the abstract of judgment for defendant's indeterminate prison commitment states in line 6 c. that defendant was sentenced to "14 years to Life on counts 3, 4." We will order the abstract of judgment corrected to reflect that defendant was sentenced to seven years to life on counts 3 and 4.

13

Finally, the abstract of judgment states that the date of conviction for count 4 was November 21, 2011. We will order the abstract of judgment corrected to reflect that defendant was convicted on November 1, 2011.

## IV. DISPOSITION

The trial court is directed to correct the minute order for the sentencing hearing to delete the reference to dismissal of the section 186.22, subdivision (b)(4)(C) allegations as to counts 3 and 4 and to the imposition of seven years to life enhancements under section 186.22, subdivision (b)(1)(C) as to counts 3 and 4 and the staying of those enhancements under section 654. The trial court is further directed to prepare an amended abstract of judgment reflecting that (1) defendant was sentenced to seven years to life on counts 3 and 4, and (2) defendant was convicted of count 4 on November 1, 2011, and to forward the amended abstract to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

HOLLENHORST
J.

We concur:

RAMIREZ
P.J.

RICHLI
J.

14