Filed 11/13/15  P. v. Zapien CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B253696 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SA062827) |
| v. | |
| JOSE ZAPIEN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, George Gonzales-Lomeli, Judge.  Affirmed.

John A. Colucci, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, James William Bilderback II and Robert C. Schneider, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

Defendant and appellant Jose Zapien was charged with two counts of special circumstance premeditated murder and 12 counts of attempted premeditated murder. The counts arose out of five separate, gang-related incidents, one in 2004 and four in 2006. A jury found defendant guilty of all counts and found true gun and gang allegations. On appeal, defendant contends that the 2004 and the 2006 counts should not have been joined for trial. He also contends, among other things, that photographic lineups were impermissibly suggestive, that the testimony of his eyewitness identification expert was improperly limited, and that there was insufficient evidence to convict him of two counts. We reject all contentions and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    Factual background.

From September 28, 2004 to December 27, 2006, five separate incidents of shootings occurred in Santa Monica. It was the prosecution's theory of the case that the shootings arose from violence between two rival gangs, Santa Monica 13 (SM13), to which the majority of victims belonged, and Sotel, to which defendant belonged.

A.    *The September 28, 2004 incident (counts 1, 2, and 3).*

At approximately 4:15 p.m. on September 28, 2004, Ricardo Nunez and Guillermo Castell were outside an apartment on Virginia in Santa Monica. Omar Nunez, Ricardo's brother, was also outside, on a street-level balcony. "[S]ome people" had followed Castell. A car, driven by someone in an orange wig and glasses, drove by two or three times. The car's passenger was a male Hispanic, 18-to-23 years old, with short or shaved black hair. Ricardo heard the driver say pull out a gun. Someone from the car yelled, " 'West Side Sotel, fuck Smacka.' " "Smacka" is a derogatory term for SM13. Shots were fired.[1] Broken glass cut Ricardo's lip.

---

[1]    Fourteen expended cartridges were recovered from the scene.

2

Atilio Polio was parking his car on Virginia when he saw "two guys in a car, one guy with a wig and makeup driving the car." The passenger was Hispanic, 18-to-20 years old.

Two days after the shooting, Ricardo was shown five sets of photographic six packs from which he identified defendant: " 'I believe he was the guy that shot at me, same look, same hair style.' " Ricardo told a detective that " 'this one [defendant] looks like the passenger.' " Omar also identified defendant from photographic six packs: " 'This looks like the person who shot at us.' " Omar recognized defendant because defendant grinned at Omar as he drove by.

Neither Ricardo nor Omar was asked to identify defendant at the preliminary hearing. Neither could identify defendant at trial.

B. *The February 28, 2006 shooting (counts 3, 4, and 5).*

On the evening of February 28, 2006, friends Michael Arceo, Tony Velasquez, and Eddie Lopez were in front of a liquor store on Pico and 26th in Santa Monica when gun shots were fired. Looking back as he ran, Arceo saw a person wearing a brown "rag" that covered his face and a black hoodie that covered his head.[2] The shooter was tall and "medium size[d]."

Before the shooting, Velasquez saw a tall, skinny guy wearing "a beanie, glasses, and a [brown] rag." The rag was wrapped around the man's face, from nose to bottom.[3] The glasses were large, square, plastic-framed sunglasses. The man pointed a gun at them and said, " 'Sotel Trece.' " He fired the gun four to five times. Velasquz and Arceo were uninjured. Lopez was killed.[4]

Anne Gesling was at the nearby theatre when she heard two-to-three gunshots and saw two young men, one wearing a hooded sweatshirt, running down Pico.

---

[2]    At the preliminary hearing, Arceo said he saw " 'strictly the eyes.' "

[3]    It was dark outside and the person stood approximately 37 feet from Velasquez.

[4]    Lopez was 15 years old.

3

The night of the shooting, Arceo was unable to make an identification, and he told officers he couldn't identify the person if seen again. But, a year later, on January 4, 2007, Arceo identified defendant from a photographic six pack in position 5: " 'I believe this is the guy that shot at me and Eddie.' "[5] Velasquez could not identify anyone from six packs.

At the preliminary hearing, Arceo testified that he saw the shooter's eyes and "three dots." Arceo and Velasquez were not asked at the preliminary hearing to identify defendant. At trial Arceo did not recall seeing three dots. Arceo and Velasquez did not identify defendant at trial.

C.    *The July 9, 2006 shooting (counts 13 and 14).*

On July 9, 2006, Krizna Ayala and Benny Arroyo were in a parked car in an alley near 1911 Euclid in Santa Monica. The alley was tagged with "RIP Boo Boo" and "RIP Limps," members of SM13. A small car drove up from behind them. Ayala saw the driver and a front passenger, who had a gun. Arroyo shoved Ayala down. Multiple shots were fired at Ayala and Arroyo, but they were not hit. Ayala thought that the passenger was the shooter.

Two months later, on September 13, 2006, Ayala identified from a photographic six pack two people she thought might be the driver and the shooter. Ayala was shown another photographic six pack in January 2007. She "pretty quickly" identified defendant: " 'This looks like the guy that shot at me.' " She "only really saw [the shooter's] eyes," and she identified defendant because "the eyeballs still look the same."[6] She could not identify defendant at trial, although he looked like the person she identified as the shooter.

---

**5**    Defendant was in the six pack because "several people" told the investigating officer that "word on the street" was a Sotel gang member by the name of Youngster or Junior was involved.

**6**    From another photographic six pack she identified John Carrillo (Wino) as the driver.

4

Arroyo testified but denied, among other things, being in the car that day and knowing of SM13. But he previously told officers that if he was forced to go to court he would say "[B]lack people did it." "Well the thing is if I go to court and they make me go to court I'm going to help that dude out. I know he's guilty. I know what it is. I already know the whole background. I'm going to say it was black people. So if he wants to take me I'm going to actually back the dude up because I can't jeopardize my family."

D. *The October 21, 2006 shooting (counts 10, 11, and 12).*

On the evening of October 21, 2006, Brittney Milan was walking near 2711 Pico Boulevard in Santa Monica. People, "maybe" three, were walking 10 to 15 feet ahead of her. A "maybe" black car was going west on Pico. The car's window was down, the car's inside light was on, and the music "was turned down." There were "[l]ike, four" people in the car, two in front and two in back, and they were laughing. The front passenger was Hispanic, "heavy, maybe bulky," with short black hair, and young. He wore a hoodie. He had three dots under his left eye.

When the car passed Milan, she saw sparks from the front passenger side, and she heard three or four gunshots. The front passenger was the shooter because he had "something out the window." Milan was shot in the leg. Milan was 15 feet from the shooter and she got a good look at him.

At the scene, Officer Russell Grimmond spoke to Juan Bonilla, who said he was with Milan and "Kanisha" the day Milan was shot. Bonilla told an officer he was walking with his friend, Jose Trejo,[7] when he heard shots. Bonilla was uncooperative with the police and would not elaborate. Bonilla used to be from SM13.[8]

---

[7]     Juan Bonilla testified but Trejo did not testify.

[8]     Juan Bonilla was Arroyo's brother-in-law. Hector Bonilla (Limpy) was Bonilla's cousin.

At the beginning of January 2007, Milan was shown photographs but she didn't want to talk at the time. But, on January 25, 2007, Milan identified defendant as the shooter from a photographic six pack. She wrote, " 'He was in the car that I was shot from.' " At trial, Milan identified defendant as the shooter.[9]

E.     *The December 27, 2006 shooting (counts 7, 8, and 9).*

On December 27, 2006, William Crishon was with his brother, Miguel Angel Martin.[10] The brothers and Abel Jimenez were walking past Virginia Park at 23rd and Pico in Santa Monica when a car with at least two people in it pulled up. The passenger asked, " 'Are you from Smacks?' " or " 'Where are the Smacks at?' " At that time, Crishon and Martin hung out with SM13. Offended, Crishon walked toward the car and the passenger repeated, " 'Are you guys Smacks?' " The passenger fired a pistol at Crishon. Martin was shot and killed. The shooter/passenger wore a "pink fright wig" and had a tattoo of three dots on his face. He was Hispanic, 17-to-early 20s, "chunky," and clean shaven. Jimenez told an officer he got a good look at the shooter and could identify him.

On January 4, 2007, Crishon identified defendant as the shooter from a photographic nine-pack. Jimenez also identified defendant as the shooter from a photographic nine-pack: "This looks like the guy that shot at us on 12-27-06."[11] Crishon identified defendant at trial as the shooter. Jimenez, however, could not identify defendant as the shooter at trial.

On January 12, 2007, Jimenez was at the LAX courthouse when he saw defendant in the lobby.[12] Scared, Jimenez called Officer Lewis and reported that he saw the shooter.

---

[9]     About two years before trial, Milan's friend told her that people knew her name and that she should be quiet.

[10]    Crishon dated Milan, although it is unclear when.

[11]    He studied the photographs for a long time before making his selection.

[12]    The parties stipulated that defendant was at the courthouse that day.

F.    *Gang evidence*.

The SM13 gang claims the entire city of Santa Monica, particularly the Pico neighborhood. Virginia Park is their main hangout. In 2005, Jonathan Hernandez (Boo-Boo) and Hector Bonilla (Limpy), both SM13 members, were murdered. The majority of victims in this case were SM13 gang members at the time of the shootings: Castell (Lil Evil); Martin (Bootsy); Velasquez (Clumsy); Arroyo (Vago); Juan Bonilla (Loony);[13] Crishon (Shady);[14] and Jimenez (Yogi). Ayala was an SM13 associate, and she was married to Limpy. Ricardo and Omar Nunez were members of CWSK, a tagging crew. Arceo was a member of Kansas Street Posse, a tagging crew, some of whose members eventually became SM13.

Sotel is one of SM13's rivals. Defendant has been a Sotel gang member since at least 2004 and was a shot caller. In 2005, Sotel 13 gang member Jose Castillo ("Raccoon") was murdered by SM13. From 2005-2006, the rivalry between SM13 and Sotel was "active"; it "seemed like there was an incident every week." Sotel uses the color brown.

Gangs have their own "code of conduct," and they distribute their own style of justice. For a gang member, "[b]eing a snitch is the cardinal sin." A gang member who testifies would be labeled a snitch, even by his or her own gang.

The People's gang expert, based on hypotheticals mirroring the facts of each incident, opined that the crimes were committed for the benefit of and in association with a criminal street gang.

G.    *Defense eyewitness expert*.

Dr. Kathy Pezdek, a professor of cognitive science and an experimental psychologist, specializes in eyewitness memory and identification. Memory doesn't work like a video camera. Instead, memory is a three-step process: (1) the "perception

---

[13]    Juan Bonilla's wife was also a member of SM13, and his sister had a child with Arroyo.

[14]    Crishon was SM13 in 2006, but he has since turned his life around.

7

phase," which is the ability to perceive a person clearly; (2) the "storage phase," which is how long after an event the person's memory is assessed and under what conditions; and (3) the "test phase," which is the procedures used to test eyewitness memory.

Factors that affect the accuracy and reliability of eyewitness identification are: (1) Exposure time. This refers to how long an eyewitness looks at the perpetrator's face. When an eyewitness looks at a person briefly, the witness is more likely to misidentify the person and they're less likely to identify the correct person. (2) Distraction. This refers to whatever else is going on during the time of exposure; for example, whether there is another perpetrator or a nearby car. (3) Weapon focus. When a weapon is present, people tend to focus on it rather than the face of the person holding the weapon. (4) Cross-race identification. People are more accurate identifying people of the same race or ethnicity. (5) Disguise. To the extent anything covered part of the suspect's face, this decreases the chance of a correct identification later. This is especially true when the upper part of the face is disguised by, for example, sunglasses, baseball caps, hoods or wigs. "Ironically, disguises to the lower part of the face, like a bandana, hamper identification less." (6) Delay in time. The longer you wait between observation and the test of what you observed, the less reliable is memory, because memory declines over time. There is not a significant correlation between a witness's confidence in their identification and accuracy.

"Suggestibility of memory" is how "post-event information" can change memory; for example, if a witness briefly observes someone at the scene of the crime and later sees a suspect at a lineup, then that post-event exposure can "suggestively influence their memory for who they thought they saw at the scene of the crime."

H.    *Defendant's alibi.*

Noah Avalos is the vice president of field operations for Sentinel, which provides "[e]lectronic monitoring, court monitoring, probation services, G.P.S. monitoring." Avalos works in the monitoring unit. The "unit calls in signals," "at specific intervals or when the participant leaves, enters, or unplugs the device. [¶] And then anything that is deemed an exception by the probation department is generated for an operator, and that

8

technician operator is then contacting either the residence or the probation department, depending on what needs to be done with that equipment."

In 2006, defendant had a transmitter placed on his ankle, and a receiver was put in his home. "Any time that that person, or that ankle unit, leaves that area, then it would report an away status." The unit calls in a report every four hours but checks every 17 seconds if the ankle bracelet is within the accepted range of 150 feet of the transponder. Based on Avalos's review of documents concerning monitoring covering July 2 through July 30, 2006, there was no indication the ankle bracelet was tampered with or that the ankle bracelet was outside the range of the home monitoring unit. Entries for July 9, 2006 did not show that the ankle unit was tampered with or that defendant went outside the range of the transponder.

There are, however, ways to remove an ankle bracelet, and such information is readily available if googled. One way to remove it is "[p]utting weight in your leg, stretching it down your leg, lubricating it with . . . olive oil, Vaseline, and slipping it off[.]"

## II.     **Procedural background.**

Two informations were filed alleging attempted murder and/or murder against defendant, the first arising out the 2004 shootings and the second arising out of the 2006 shootings. The trial court granted the People's motion to consolidate the cases.

A jury, on November 12, 2013, found defendant guilty as follows:

- *September 28, 2004 shootings*. Counts 1, 2, and 3, the attempted premeditated murders (Pen. Code, §§ 187, 664)[15] of Castell, Ricardo Nunez, and Omar Nunez, respectively.

- *February 28, 2006 shootings*. Count 4, the premeditated murder of Eddie Lopez, and counts 5 and 6, the attempted premeditated murders of Velasquez and Arceo.

---

[15]     All undesignated statutory references are to the Penal Code.

- *December 27, 2006 shootings.* Count 7, the premeditated murder of Martin, and counts 8 and 9, the attempted premeditated murders of Jimenez and Crishon.
- *October 21, 2006 shootings.* Counts 10, 11, and 12, the attempted premeditated murders of Milan, Juan Bonilla, and Trejo.
- *July 9, 2006 shootings.* Counts 13 and 14, the attempted premeditated murders of Ayala and Arroyo.

The jury found true gang allegations as to all counts (§ 186.22, subd. (b)(1(C)). As to all attempted murder counts except count 10 (Milan), the jury found true personal gun use allegations under section 12022.53, subdivisions (b) and (c). As to the Milan[16] and murder counts, the jury found true personal gun use allegations under section 12022.53, subdivisions (b), (c), and (d). As to the murder counts, the jury found true multiple murder and gang special circumstance allegations (§ 190.2, subd. (a)(3), (22)).

On January 9, 2014, defendant was sentenced to life without the possibility of parole on count 7, the murder of Martin, plus 25 years to life for the firearm enhancement. The trial court sentenced him, on counts 8 and 9, to a consecutive 15 years to life each plus 20 years to life for the firearm enhancement. On counts 1-3, 5-6, and 10-14, he was sentenced concurrently on each to 15 years to life plus 20 years to life for the firearm enhancement. On count 4, the murder of Lopez, he was sentenced to a concurrent term of 25 years to life plus 25 years to life for the firearm enhancement. His total term was life without the possibility of parole plus 95 years to life.

## DISCUSSION

**I.    Joinder of the 2004 and 2006 shootings for trial did not deny defendant due process and a fair trial.**

The 2004 and 2006 shootings were filed as separate cases. The trial court granted the People's motion to consolidate them on the grounds that evidence as to motive and intent was cross-admissible, the crimes were of the same class, and there was no showing

---

**16**    Milan was shot in the leg.

that adding the 2004 counts prejudiced defendant.[17] Defendant now contends that the court abused its discretion by failing to sever the counts for trial and that the prejudicial effect of the joinder denied him due process. We disagree.

The law favors prefers consolidation of charges. (*People v. Soper* (2009) 45 Cal.4th 759, 771-772; *Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1220; *People v. Manriquez* (2005) 37 Cal.4th 547, 574.) Section 954 therefore provides that an "accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated." (§ 954; see also *Soper,* at pp. 769, 771.) If these statutory requirements for joinder are met, a court nonetheless may, in its discretion, order counts to be tried separately. (§ 954; *People v. Thomas* (2012) 53 Cal.4th 771, 798.) A trial court's ruling is reviewed for abuse of discretion, and, to establish such abuse, the defendant must make a clear showing of prejudice. (*Thomas,* at p. 798; *Soper,* at pp. 773-774; *Williams v. Superior Court* (1984) 36 Cal.3d 441, 447, superseded by statute on other grounds, as stated in *Alcala*, at p. 1229, fn. 19.)

To determine whether a trial court abused its discretion, we consider, first, the cross-admissibility of evidence in hypothetical separate trials.[18] (*People v. Soper, supra,* 45 Cal.4th at p. 774.) Cross-admissibility of evidence alone is normally sufficient to dispel any suggestion of prejudice. (*Id.* at p. 775; *Alcala v. Superior Court, supra,* 43 Cal.4th at p. 1221.) If the evidence would not be cross-admissible, we consider " 'whether the benefits of [the] joinder were sufficiently substantial to outweigh the possible "spill-over" effect of the "other-crimes" evidence on the jury in its consideration of the evidence of defendant's guilt of each set of offenses.' [Citations.] In making *that*

---

[17] The defense made no motion to sever any of the 2006 counts from each other.

[18] Our review of a trial court's ruling on a severance motion is based on the record as it existed at the time of the ruling. (*People v. McKinnon* (2011) 52 Cal.4th 610, 630.)

assessment, we consider . . . : (1) whether some of the charges are particularly likely to inflame the jury against the defendant; (2) whether a weak case has been joined with a strong case or another weak case so that the totality of the evidence may alter the outcome as to some or all of the charges; or (3) whether one of the charges (but not another) is a capital offense, or the joinder of the charges converts the matter into a capital case."[19] (*Soper,* at p. 775.)

Here, the statutory requirements of section 954 were met. The 2004 counts and the 2006 counts were of the same class of assaultive crimes; namely, murder and attempted murder. (*People v. Miller* (1990) 50 Cal.3d 954, 987.) Because the statutory requirements of joinder were met, defendant, to establish that the court nonetheless abused its discretion, has the high burden of showing clear prejudice.

This burden has not been met. Gang evidence would have been cross-admissible on the issues of motive and the identity of the shooter, the latter of which was a key disputed issue. SM13 and Sotel (defendant's gang) were rivals, with that rivalry becoming especially intense in 2005 and 2006. Almost all victims were SM13 or part of a tagging crew. The one victim who arguably was not associated with SM13 was Milan, who nonetheless was walking near SM13 members Juan Bonilla and Trejo when she was shot.[20] Also, the driver of the car in the September 28, 2004 counts wore an orange wig and glasses. The shooter in the December 27, 2006 counts wore a pink fright wig. The use of a distinctive wig tended to establish defendant's involvement in both shootings. (Compare *Williams v. Superior Court, supra,* 36 Cal.3d at p. 450 [very little similarity existed between two gang shootings occurring nine months apart to support joinder].)

Even if we agreed there was no cross-admissibility of evidence, joinder would still have been appropriate. (See generally § 954.1; *Alcala v. Superior Court, supra,* 43 Cal.4th at p. 1222 [absence of cross-admissibility alone is insufficient to establish

---

[19] The third factor is not at issue.

[20] Milan also dated the victim of count 9, Crishon, although it is not clear when they dated.

prejudice].) The benefits of joinder did not outweigh any possible prejudice from the "spill-over" effect of other crimes evidence. No one incident was more inflammatory than another. Rather, all charges arose from the same set of facts, basic and generic in the sense that they were gang-related drive-by shootings. The primary identifications all were made from photographic line ups. Although defendant argues that some identifications were weak because, for example, no witness to the September 28, 2004 shooting identified him in court,[21] for each shooting, including the September 28 one, defendant was identified as the shooter from photographic lineups. Although defendant argues he had an "ironclad alibi" to the July 9, 2006 shooting, based on evidence he was on home arrest, that alibi, as we discuss *post*, was not "ironclad." There was evidence that ankle monitoring bracelets, such as the one defendant wore, can be tampered with. No one of the five incidents was therefore particularly stronger or weaker than the other.

We therefore conclude that joinder was appropriate under section 954 and that defendant has failed to make a clear showing consolidation prejudiced him.

## II. The photographic lineups are not unduly suggestive.

Before trial, defendant moved to suppress Arceo's, Ayala's, Crishon's, and Jimenez's identifications from photographic lineups, on the ground that defendant was the only person in the lineup with three dots under one eye.[22] The trial court denied the motion, finding that the lineups were not impermissibly suggestive and, in any event, the identifications were reliable.[23]

---

[21] Although defendant decries the lack of in-court identifications, defendant's own expert witness, Dr. Pezdek, cast doubt on the virtue of such in-court identifications.

[22] Arceo testified at the preliminary hearing that the shooter had three dots near his eye. Crishon and Milan testified at trial that the shooter had three dots.

[23] In denying the motion, the court noted that nothing before it suggested that the police, when they put the lineups together, had information the suspect had such a tattoo.

13

To determine "whether the admission of identification evidence violates a defendant's right to due process of law, we consider (1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification." (*People v. Cunningham* (2001) 25 Cal.4th 926, 989; see also *Manson v. Brathwaite* (1977) 432 U.S. 98, 106-114.) "The question is not whether there were differences between the lineup participants, but 'whether anything caused defendant to "stand out" from the others in a way that would suggest the witness should select him.' " (*People v. Avila* (2009) 46 Cal.4th 680, 698; *Cunningham*, at p. 990.) An identification procedure is sufficiently neutral where the subjects are " 'similar in age, complexion, physical features and build . . .' [citation]." (*People v. Leung* (1992) 5 Cal.App.4th 482, 500; see generally *People v. Johnson* (2010) 183 Cal.App.4th 253, 271-272.) "The defendant bears the burden of demonstrating the existence of an unreliable identification procedure." (*Cunningham,* at p. 989.) "[C]onvictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." (*Simmons v. United States* (1968) 390 U.S. 377, 384; accord, *Cunningham*, at p. 990.)

We have examined all photographic lineups, including ones in which defendant has a three dot tattoo (People exhibits 44, 78, and 79).[24] In each lineup, all men appear to be of the same age: young and in their 20s. All look Hispanic. All have short or very closely cropped-to-bald dark hair. In exhibit 44, the men have a similar build, slightly

---

[24] People's exhibits 78 (shown to Crishon) and 79 (shown to Jimenez) are the same lineup.

14

husky. In exhibits 78 and 79, the photographs are more closely cropped, revealing less of their build. True, in each lineup, only defendant has a facial tattoo, three dots near his left eye. But the tattoo does not cause defendant to "stand out" in such a way as to suggest to the victims that they should select him. The tattoo is barely visible in exhibit 44. The tattoo is more visible in exhibits 78 and 79, but it is in no way prominent. Indeed, no witness indicated he or she selected defendant because of the tattoo. The identification procedure was not unduly suggestive.

## III.    Eyewitness identification expert witness testimony.

Defendant contends that the trial court improperly limited the testimony of his eyewitness identification expert, thereby denying him due process and the ability to present his only defense. We disagree.

" 'California law permits a person with "special knowledge, skill, experience, training, or education" in a particular field to qualify as an expert witness (Evid. Code, § 720) and to give testimony in the form of an opinion (*id.*, § 801). Under Evidence Code section 801, expert opinion testimony is admissible only if the subject matter of the testimony is "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." [Citation.]' " (*People v. Vang* (2011) 52 Cal.4th 1038, 1044.) A trial court, however, has broad discretion to admit or exclude expert testimony. (*People v. McDowell* (2012) 54 Cal.4th 395, 426.)

Here, the trial court curtailed defense efforts to link wrongful convictions and eyewitness identifications.[25] The court, for example, precluded the doctor from testifying about research regarding people who were convicted but were found to be factually

---

[25]    Before trial, the People moved in limine to limit Dr. Pezdek's testimony. The trial court noted that eyewitness experts "are allowed to testify to anything related to the evidence given hypotheticals," although some experts "don't know how to keep their parameters." "[S]o I want Dr. Pezdek to focus on just generic factors."

innocent.[26] The court also precluded her from discussing double-blind procedures, which is when the person conducting the procedure or test does not know who is the suspect. The court ruled that this "is one of the things I was not going to allow, police procedure and tactics." The court also struck Dr. Pezdek's testimony that identifications are less likely to be accurate in cases involving multiple perpetrators.

Even if we agreed that the trial court's rulings were in error, the errors were not prejudicial and defendant's due process rights and right to present a defense were not infringed. (See generally *Holmes v. South Carolina* (2006) 547 U.S. 319, 324; *Crane v. Kentucky* (1986) 476 U.S. 683, 690; *Chambers v. Mississippi* (1973) 410 U.S. 284, 294; *People v. Partida* (2005) 37 Cal.4th 428, 435 [absent fundamental unfairness, state law error in admitting evidence is subject to the test in *People v. Watson* (1956) 46 Cal.2d 818; namely, whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error].) Although the right to present a defense can be abridged by evidence rules that infringe on the weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve (*Holmes*, at p. 324), the ordinary rules of evidence generally do not impermissibly infringe on the accused's right to present a defense (*id.* at pp. 326-327).

---

[26] Defense counsel asked the doctor whether, "[a]s part of staying current in the field of eyewitness identification, have you familiarized yourself with recent research regarding individuals, somewhere in the neighborhood of 250 individuals, who have been convicted, and then" "were later exonerated, found to be factually innocent?" The People objected that "this was directly specified in our 402 motion." The trial court ruled, "Yes, it has nothing to do with this witness's expertise."

When Dr. Pezdek, during cross-examination, was explaining the studies she conducts and that it is not possible to include real crime victims, she referred to databases concerning people who were wrongfully convicted. The court struck that testimony. When the doctor said that she takes "into consideration both research studies that I and other people have done and databases of victims of real crimes and how many incorrect convictions there –," the court struck the testimony.

16

Defendant had a meaningful opportunity to present his defense that he was wrongfully identified. Evidence, for example, was presented that Ayala misidentified defendant as the July 9, 2006 shooter, because defendant was on home arrest that day. The defense had the opportunity to cross-examine the witnesses about their identifications. Dr. Pezdek also educated the jury about the factors leading to inaccurate identifications (e.g., the short amount of time the witnesses had to view the shooter; the distracting presence of a gun; the shooter's disguise; the distracting presence of another perpetrator; and the delay between some incidents and identifications). To the extent defendant argues he should have been allowed to ask the doctor hypotheticals applying these factors to the evidence, along the lines of hypotheticals asked of gang experts (see generally *People v. Vang, supra,* 52 Cal.4th 1038), the record does not show that defense counsel tried to and was precluded from posing such hypotheticals. In any event, the jury was more than capable of applying those factors to the case, even in the absence of specific hypotheticals modeled on the facts of the case. And, to the extent defendant wanted Dr. Pezdek to go beyond a simple statement that she stays current in her field by reviewing, for example, research about wrongful convictions, the trial court would have been within its discretion to limit such testimony under Evidence Code section 352.

Finally, we fail to see how the trial court's exclusion of a portion of the expert's curriculum vitae was reversible error. The People objected to the admission of Dr. Pezdek's resume as hearsay and under Evidence Code section 352.[27] Because the document went "way beyond" documenting the doctor's expertise, training, and experience, the court excluded five or six pages. The record does not contain the excluded portion, and it is not otherwise clear from the record what that excluded portion contained. We therefore cannot evaluate this issue. In any event, the trial court admitted a portion of her resume. Dr. Pezdek also testified about her credentials. Defendant has

---

[27] The entire resume, including the excluded portion, appears to have been 10 pages double sided.

17

not established that the exclusion of the remainder of her resume either was an abuse of discretion or could have prejudiced defendant to such an extent as to warrant reversal.

**IV.  The July 9, 2006 shootings (counts 13 and 14).**

Defendant raises two arguments specific to the July 9, 2006 attempted murders of Ayala and Arroyo:  A.  there was insufficient evidence to support his conviction of those counts because he was on house arrest that day, and B.  the trial court denied defendant his due process rights by excluding documents about the electronic monitoring.

A.  *The evidence was sufficient to support defendant's conviction.*

To determine whether the evidence was sufficient to sustain a criminal conviction, "we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citations.]" (*People v. Snow* (2003) 30 Cal.4th 43, 66.)  We presume in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence.  (*People v. Medina* (2009) 46 Cal.4th 913, 919.)  " 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citation.]  We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.  [Citation.]'  [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict.  [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 318-319.)  Unless the testimony is physically impossible or inherently improbable, a single witness's testimony is sufficient to support a conviction.  (*People v. Scott* (1978) 21 Cal.3d 284, 296.)

18

Ayala and Arroyo were the two victims of the July 9, 2006 shooting. Ayala identified defendant as the shooter. Although at trial Arroyo denied being present at the shooting, he admitted to police officers that he was present but did not want to identify defendant because he didn't want to jeopardize his family, even though "I know he's guilty." These statements were recorded and played for the jury. Defendant argues that these identifications were impossible or inherently improbable because he was on home arrest on July 9, 2006. Avalos did testify that defendant, on July 9, 2006, was being electronically monitored. The monitoring report showed that defendant was within 150 feet of his home all day, and the report did not indicate that the ankle bracelet had been tampered with. Still, Avalos conceded that there are ways, readily researchable on the internet, to remove the ankle bracelet:

"Q. So there are ways to defeat these, it's readily available on the internet, correct?

"A. There are ways to try to defeat it, yes.

"Q. There are ways that you can defeat it, correct?

"A. There are – yes."

The evidence therefore shows that it was possible for defendant to commit the July 9 crimes. Defendant's argument amounts to an improper request we reweigh the evidence and make credibility determinations.

B. *Any error in excluding the monitoring report was harmless.*[28]

Although Avalos testified from documents concerning the electronic monitoring of defendant's ankle bracelet, the People objected on foundational grounds to the admission of the documents. The trial court agreed that there was "sufficient authenticity and foundation" for the documents—"otherwise, I wouldn't have allowed the witness to testify"—but the court refused to admit them into evidence. Even if the trial court erred by excluding the report or documents, the error was not prejudicial. Avalos testified

---

[28] The monitoring report is attached to a subpoena duces tecum. We assume that is what was marked as defense exhibit C but that was not admitted.

19

about the documents.  He read each of the entries for July 9, 2006.  The report showed no indication defendant was outside the 150 feet range of the home unit.  For the days that defendant was on probation in July 2006 there was no indication of tampering.  The substance of the report therefore was before the jury, and the admission of the report itself would have added little

## V.     Cumulative error.

Defendant contends that the cumulative effect of the purported errors deprived him of a fair trial.  As we have " 'either rejected on the merits defendant's claims of error or have found any assumed errors to be nonprejudicial,' " we reach the same conclusion with respect to the cumulative effect of any purported errors.  (*People v. Cole* (2004) 33 Cal.4th 1158, 1235-1236; *People v. Butler* (2009) 46 Cal.4th 847, 885.)

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ALDRICH, J.

We concur:

EDMON, P. J.

JONES, J.*

_____

*  Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.